In *Weller v. ABC*, 232 Cal. App. 3d 991, 1009 (1991), the court agreed that plaintiff was required to prove "the falsity of the implied defamatory facts", not the "falsity of the express statements" made by the defendants. The *Weller* court noted,

> "[I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he may be held responsible for the defamatory implication, . . . even though the particular facts are correct." *Id.* at 1003.

\*            \*            \*            \*

> "[t]he concept that it is the gist or sting of the alleged defamatory statements that must be false rather than the specific details of the charge is deeply rooted in our common law." *Id.* at 1009.

The defendants in *Weller* broadcast several stories about candlesticks that were sold by Mr. Weller to a local museum. In the story, the defendants captioned the local broadcast "Museum Fraud?" after a lengthy broadcast about antique fraud, and suggested that Mr. Weller had connections to a man recently convicted of fraud, that a local woman, whose house happened to be only blocks from Mr. Weller's shop, claimed to have had similar candlesticks stolen, that Mr. Weller had 'repaired' the candlesticks thus decreasing their value, and that Mr. Weller refused to disclose the name of the prior owner.

Some of the aforementioned statements were correct; however, the court considered the overall implication of the statements, i.e. the "gist" or "sting", not the accuracy of each statement individually. The court also admitted the expert testimony of a linguistic professor to explain how an average viewer would understand the broadcasts as implying defamatory facts.

Likewise, in this case, the Program was entitled "Enough!", the preachers were "bad guys", the donors were being "hosed" and in response to a parishioner confidently telling a reporter that her money was put to "excellent" use, the ABC Defendants' deceptively edited a Clip into the Program to make it appear that Plaintiff was making self-condemnatory statements. Moreover, the ABC reporters, Diane Sawyer, Robin

Roberts and John Stossel, used a tone of voice which created a sense of incredulity, shock and scandal that contributed to a frame through which viewers were led to believe that Plaintiff's conduct was deceitful, unethical and entirely inappropriate for a minister of God. Evidence that the ABC Defendants intended the "gist" of the Program to convey the defamatory implications that Plaintiff was unethical, unfit to serve as a minister, and that his wealth was misappropriated from his parishioner's donations will serve to confirm the reasonableness of the implications and insinuations alleged and explained by Plaintiff's linguistic expert, Professor Finegan.

### B. Defendants' Intent To Create a Defamatory Broadcast Is Probative of the "Gist" and "Sting" of the Message Received by Viewers.

#### 1. Evidence that Defendants Intended to Depict Plaintiff as Corrupt and Unethical Supports a Finding of a Defamatory Implication.

Evidence that the ABC Defendants intended to defame Plaintiff by depicting him as corrupt, immoral and engaging in criminal conduct may be used to support the reasonableness of Plaintiff's argument that the Program contained defamatory implications. "[E]vidence of...intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's...knowledge of falsity.' *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 709 (2007). As stated in *MacLeod v. Tribune Pub. Co.* 52 Cal.2d 536, 551 (1959):

> "When as in this case, it can be reasonably inferred from the language used that defendant intended to charge plaintiff with communist sympathies and that many readers so interpreted its article, and defendant has admitted by demurring that such was its intent and the meaning placed on its article, <u>it ill befits defendant to contend that it should escape liability on the ground that owing to a possible innocent meaning some of its readers did not draw the defamatory inference it intended that they should.</u>" (emphasis added).

Defendants' delayed, post-litigation attempt to portray the Program in a more innocent light must be viewed as at best a possible "innocent construction." However,

the evidence will demonstrate that by editing the footage received and through instructions given to reporters, ABC *intended* the defamatory implications and they must be held responsible for the message they chose to send. The evidence will fully support Plaintiff's, his congregants', and Professor Finegan's interpretation—that the ABC Defendants intended to broadcast a story about pilfering preachers and deceitfully edited footage they received in order to fit their sensationalized story idea.

### 2. Evidence that Defendants Intentionally Edited the Footage to Falsely Attribute to Plaintiff Self-Condemnatory Statements Supports a Finding of a Defamatory Implication.

As stated by the Supreme Court,

> "[a] self-condemnatory quotation may carry more force than criticism by another. It is against self-interest to admit one's own criminal liability, arrogance, lack of integrity, and so all the more easy to credit when it happens." *Masson v. New Yorker Magazine*, (1991) 501 U.S. 496, 512.

Furthermore, as recognized by Judge Kozinski in his dissent in *Masson v. New Yorker Magazine*, 895 F. 2d 1535, 1550 (9th Cir. 1989),

> "By putting the phrase into [plaintiff]'s own mouth and concealing [the defendant]'s role as interpreter and editor, [defendant] has caused [plaintiff] a serious injury and made it look like a self-inflicted wound."

Judge Kozinski also discussed his outrage that a derogatory statement about the plaintiff that was <u>intended</u> by a defendant to be interpreted in a negative manner would ever be given a more innocuous meaning, "I can see no justification for giving this emotionally loaded term the most innocuous conceivable interpretation, an interpretation contrary to the one in fact intended by the author." *Masson v. New Yorker*, 895 F. 2d at 1551.

Thus, when the ABC Defendants deceptively edited footage to falsely attribute self-condemnatory statements to Plaintiff wherein he appeared to be bragging about his personal wealth, the message was all the more powerful to the viewers as it was coming directly from the Plaintiff's own mouth.

1. Discovery of all of the footage received by the ABC Defendants from the Trinity Defendants will support Plaintiff's argument that the ABC Defendants' carefully calculated intent was to create a program depicting preachers who were living extravagant lives paid for by misappropriated donations intended for their churches. Discovery of this footage is critical to support Plaintiff's representations to this Court regarding the "gist" or "sting" of the Program. As cited above in *MacLeod v. Tribune Pub. Co.*, 52 Cal.2d at 551, a Defendant who intended a defamatory message should not escape liability just because that Defendant is able to contrive a more innocent interpretation after litigation has begun.

### C. Discovery Will Reveal that Defendant *Intended* the Defamatory Implication that Plaintiff Misappropriated Church Funds.

In a defamation action against a broadcaster and a magazine, the Supreme Court acknowledged, "unless liability is to be completely foreclosed, the thoughts and editorial processes of the alleged defamer would be open to examination." *Herbert v. Lando*, 441 U.S. 153, 160 (1979). A "jury ha[s] the right to read [a] publication with an eye upon the question of <u>what ideas it was calculated to bring to the average reader</u>…(emphasis added)" *Empire Printing Co. v. Roden*, 247 F 2d 8, 14 (9th Cir. 1957). "The truth which is admitted as a defense in such an action as this is the truth of the alleged words…in the sense in which they were used and <u>intended to be understood</u>…." (emphasis added) *Id.* at 17.

In *Empire*, the court upheld a jury's verdict in favor of defamation plaintiffs based on evidence of the defendant's intent to create the defamatory implications. The court held that the defendant's actual malice was sufficient proof of the defendant's calculated intent to create the defamatory message.

> "In our view the record warrants the jury's finding that the publication <u>was calculated</u> to charge the more serious and more degrading type of offense, and the attempted justification was not sustained." *Empire Printing Co. v. Roden*, 247 F 2d at 15 (emphasis added).

1  In *Empire*, the publisher intentionally used sensationalized headlines, dramatic language, and carefully positioned the article to send a defamatory message. *Id.* at 14-15. Thus the Ninth Circuit held,

> "The reference in the right hand headline to the diverting of funds to a 'private' bank account fits into what the jury could find to be <u>a calculated creation of inferences</u> of graft and corruption. The casual reader of this page might thus be given the impression that the diversion is to 'private uses.' *Id.* at 16 (emphasis added).

## IV. ABC: PLAINTIFF IS NOT ENTITLED TO THE REQUESTED DISCOVERY IN ORDER TO OPPOSE THE ANTI-SLAPP MOTION

### A. ABC: THE NEWS REPORT

The fiscal transparency of religious organizations has long attracted public scrutiny. Decades ago, the federal government considered legislation to mandate financial disclosures by religious groups, just like most charitable organizations. Since that time, there have been numerous news articles regarding the financial transparency of religious organizations, there has been academic research on the issue, and watchdog groups have formed to monitor and lobby for fiscal transparency. The United States Senate is currently investigating the financial transparency and accountability of media-based ministries. *See* Fink Decl. ¶ 4.

Consistent with this widespread, long-standing interest in the fiscal transparency of religious organizations, ABC broadcast the News Report. On March 23, 2007, ABC's news program "Good Morning America" ("GMA") previewed the News Report and later that evening, the News Report was shown in full on ABC's news program "20/20," presented by ABC News Correspondent John Stossel ("Stossel"). (For the convenience of the Court, ABC has submitted herewith electronic copies of the News Report broadcast on "GMA" and "20/20." Fink Decl. ¶ 2 (Ex. A (News Report on "20/20" (Track 1) and News Report on "GMA" (Track 2))).

The News Report was part of a larger story on "GMA" and "20/20" entitled

"Enough." The "Enough" story showcased interviews with individuals who have taken personal, moral stances on a variety of topics. Fink Decl. ¶ 3. The News Report segment featured an interview with Rusty Leonard ("Leonard"), the founder of a watchdog group named "Ministry Watch."

Leading up to the Leonard interview, the News Report begins with Stossel posing the following question to the viewers: "They preach the gospel of giving to God. But how much of what you give do they keep for themselves? Is it time for someone to say enough?" Stossel opines that "[m]aybe they will do great things with your money." The News Report then shows audio-visual clips of several ministers preaching, but not Plaintiff. Fink Decl. ¶ 2, Ex A ("20/20" (Track 1)).

The News Report then turns to a brief interview with a member of Plaintiff's ministry who states that she believes her "money is being put to excellent use, without one question." Stossel then responds, "[a]nd yet her pastor, Fred Price, boasts that . . . [cutting to a 9-second audio-visual clip of Plaintiff]: *'I live in a 25-room mansion. I have my own $6 million yacht. I have my own private jet, and I have my own helicopter, and I have seven luxury automobiles'*" (the "Clip"; emphasis added). Stossel acknowledges Plaintiff's candor about his wealth, stating, "At least he tells people about it, but many preachers don't advertise how well they live." Following the Clip, the News Report turns to video clips of *other ministers* who are *less forthcoming* about their wealth. The News Report thus highlights Plaintiff's candor about his personal wealth, in contrast to other ministers who are not as open about their material success. Kenneth Copeland is one such minister who is described in contrast to Plaintiff. Stossel explains that Copeland's ministry and other ministries "point out that they comply with all IRS regulations." The News Report then turns to Leonard, who believes that complying with all IRS regulations is "not good enough." *Id.*

The News Report features an interview with Leonard, which lasts approximately five minutes (5:00). Stossel introduces Leonard as a "deeply religious man who invests and lectures about investing in companies that he believes have Christian friendly

values." In a voice-over, Stossel reports that Leonard started Ministry Watch because he thought it was "un-Christian" that so many ministers "ask donors for money but don't reveal exactly how they spend it." During Stossel's voice-over, an image of Leonard working at his desk spans the top half of the screen, while images of ten (10) different ministers flash, three (3) at a time, across the lower portion of the screen for approximately eight seconds (00:08). Plaintiff is one of those ten ministers, and his image appears, along with two (2) other ministers, for approximately one second (00:01).[2] Leonard expresses his opinion that donors are being "hosed" if they do not know whether their money is being well spent. Turning to a clip of a Ministry Watch employee, the News Report shows how Ministry Watch asks ministries to reveal their finances. Stossel then explains that while most charities are legally required to publicly report their finances, religious organizations are not legally required to do the same. *Id.*

Stossel reports that Ministry Watch has criticized approximately twenty-eight (28) religious groups. At this point, an image of Ministry Watch's "Transparency List" flashes on the screen for approximately five (00:05) seconds showing approximately eleven (11) ministries, including Plaintiff's Crenshaw Christian Center Church. Mr. Stossel then identifies three (3) specific televangelists, Benny Hinn, Creflo Dollar, and Rod Parsley, whom Ministry Watch has criticized "for being secretive for having little or no financial transparency." Leonard offers his opinion that people should not donate to such ministries because they are not open about how they spend donations. Leonard, however, is careful to note that the lack of openness does not mean that the ministries are doing anything "wrong," although the possibility exists. *Id.*

Leonard expresses his opinion that there are "good guys" and "bad guys" in the religious fund-raising arena, and that there are "a lot more good guys than there are bad

---

[2] The voice-over states: "Leonard walked away from a seven-figure salary because he thought it was un-Christian that he [image of minister], and he [image of minister], and she [image of minister], and so many others [image of Plaintiff and other ministers] ask donors for money but don't reveal exactly how they spend it." *Id.*