1 guys." Stossel reports Leonard's belief that the vast majority of ministries "do a good
2 job and spend your money well." Still, Leonard remains critical of televangelists who
3 own multiple multi-million dollar homes in gated communities and travel the world in
4 multi-million dollar jets, such as televangelists Jan and Paul Crouch. Leonard opines
5 that such ministers do "some good works, but they could spend a whole lot more money
6 if they sold the house and the car and the jet plane." Leonard expresses his personal
7 belief that the leadership of ministries should, like Jesus did, maintain some degree of
8 sacrifice. The News Report then discusses televangelist Joyce Meyer, whose improved
9 financial transparency earned praise from Leonard. Following the Leonard interview,
10 the News Report ends. *Id.*

11     The Leonard interview constituted approximately seventy-five percent (74.75%)
12 of the News Report broadcast on "20/20" (roughly five minutes and five seconds (5:05)
13 out of the approximately six minute, forty-eight second (06:48) segment); approximately
14 forty percent (41.98%) of the News Report excerpt on GMA was from the Leonard
15 interview (roughly one minute and eight seconds (01:08) out of the approximately two
16 minute, forty-two seconds (02:42) segment).

17     Following ABC's broadcast of the News Report, Plaintiff demanded a retraction
18 on the ground that, during the sermon shown on the Clip, Plaintiff was literally talking
19 about the wealth of a hypothetical person, not his own wealth. ABC timely broadcast a
20 retraction on both GMA and 20/20. The retraction was approximately fifty-eight
21 seconds (00:58), and acknowledged that Plaintiff was talking about a hypothetical man
22 in the Clip as broadcast.[3] Even after ABC broadcast the retraction, Plaintiff still filed

---

[3] In reference to the Clip, the retraction broadcast on "20/20" stated the following: "We thought Dr. Price . . . was talking about himself, but we later learned he was preaching a sermon about a hypothetical person who had many material possessions but lived a spiritually unfulfilled life. We'd used his quote out of context, and for that, we apologize to Dr. Price and the Crenshaw Christian Center. And we apologize to you if we misled you. Also, the Center sent us a statement saying Dr. Price is paid, quote, 'a salary commensurate with his duties' and that the church, quote, 'openly shares its

this lawsuit. Fink Decl. ¶¶ 5-6.

### B. ABC: THE SCOPE OF THE ANTI-SLAPP MOTION

#### 1. The Governing Standards For Anti-SLAPP Motions

Pursuant to the Anti-SLAPP Statute, "a cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike." Cal. Civ. Proc. Code § 425.16(b). Under the Anti-SLAPP Statute, ABC carries the initial burden simply to show that Plaintiff's claims arise from an "act" made in connection with a public issue or an issue of public interest, in furtherance of Defendants' right of free speech under the United States or California Constitutions. *See* Cal. Civ. Proc. Code § 425.16(b)(1). ABC's Anti-SLAPP Motion will establish that the News Report was an "act" under the anti-SLAPP statute because it was: (1) speech in a public forum, (2) conduct in furtherance of ABC's right of free speech , and (3) made in connection with an issue of public interest. *See* § 425.16(b)(1), (e)(3) & (4).

Once ABC has met its burden to show that its conduct is covered by the Anti-SLAPP Statute, the burden shifts to Plaintiff to establish "by competent and admissible evidence," a reasonable probability that he will prevail on his claims at trial. *Macias v. Hartwell*, 55 Cal. App. 4th 669, 675 (1997). In order to meet this burden, Plaintiff "cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial." *HMS Capital, Inc. v. Lawyers Title Co.*, 118 Cal. App. 4th 204, 212 (2004); *see Levy v. Santa Monica*, 114 Cal. App. 4th 1252, 1262-63 (2004). The

---

financial information with its congregation." In addition to "20/20," ABC broadcast a substantively identical retraction on "GMA" and published a substantively identical retraction on ABC's website. Fink Decl. ¶ 6. Nevertheless, ABC's Anti-SLAPP Motion will demonstrate (a) that the Clip was an accurate portrayal of Plaintiff's own substantial wealth; and (b) that Plaintiff does not share his church's financial information with third parties.

1  Court "should grant the [anti-SLAPP] motion if, as a matter of law, the defendant's
2  evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary
3  support for the claim." *Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 821
4  (2002), *superseded by statute on other grounds by* Cal. Civ. Proc. § 425.18(b)(1).

5      Federal courts within the Ninth Circuit have routinely applied the Anti-SLAPP
6  Statute to dispose of meritless claims. *E.g., Vess v. Ciba-Geigy Corp. USA*, 317 F.3d
7  1097, 1110 (9th Cir. 2005); *New.net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090 (C.D. Cal.
8  2004); *Thomas v. L.A. Times Commc'ns, LLC*, 189 F. Supp. 2d 1005 (C.D. Cal. 2002).

### 2. Plaintiff, As A Public Figure, Bears The Burden Of Proving Falsity

11      Public figures are characterized as "hav[ing] voluntarily thrust themselves to the
12  fore, inviting attention and comment." *Vegod Corp. v. American Broadcasting*
13  *Companies, Inc.*, 25 Cal. 3d 763, 767 (1979). Plaintiff acknowledges that he is a public
14  figure. *See* Compl. ¶¶ 1, 18-19.

15      Public figures must satisfy a heightened standard to maintain an action for
16  defamation. As the California Supreme Court instructed, there is "leeway for criticism
17  of an individual who voluntarily injects himself or herself into public controversy."
18  *Okun v. Sup. Crt.*, 29 Cal. 3d 442, 451 (1981). Indeed, where the plaintiff is a public
19  figure, or when the statements are matters of public concern published by a media
20  defendant, "the burden is on the *plaintiff* to prove falsity." *Moyer v. Amador Valley J.*
21  *Union High School Dist.*, 225 Cal. App. 3d 720, 725 n.2 (1990) (emphasis in original);
22  *see also Vogel v. Felice*, 127 Cal. App. 4th 1006, 1021 (2005); *Milkovich v. Lorain*
23  *Journal Co.*, 497 U.S. 1, 16 (1990). Plaintiff must prove that there was a publication of
24  a *false statement of fact*. *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 26, 27 (2007).

25      A statement is not false if it is "*substantially* true." *Vogel*, 127 Cal. App. at 1021
26  (emphasis in original). An "assertion . . . may be substantially true even if it is literally
27  false." *Id.* at 1024 n. 7. Indeed, "'[m]inor inaccuracies do not amount to falsity so long
28  as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New*

*Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (citation omitted).

Thus, in order to demonstrate a probability of prevailing on his defamation claim, Plaintiff must: "(1) identify[] statements that conveyed provably false and defamatory imputation," and (2) "present[] evidence that the statements were in fact substantially false, *i.e.*, diverged from the true facts in and to such manner and degree as to produce a more damaging effect on the mind of the reader than would the truth." *Vogel*, 127 Cal. App. 4th at 1021.

Pertinent here, a defamation plaintiff *cannot* recover for (1) statements that are *true* or *substantially true*; (2) statements that are not *provably false statements of fact* (and, thus, are no more than hyperbolic or colorful language, statements on morality, subjective comment and opinion, or questions and inquiries); (3) statements that do not concern *Plaintiff*; or (4) statements that were never made. *See, e.g., Vogel*, 127 Cal. App. 4th at 1021 (statement not actionable if substantially true); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 809-12 (2002) (statements not actionable if not provably false statements of fact); *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1044 (1986) (statements must be of and concerning plaintiff); *Terry v. Davis Cmty. Church*, 131 Cal. App. 4th 1534, 1553-56 (2005) (statements not actionable if never made).

Thus, while Plaintiff bears the burden of proving falsity, truth is an absolute defense to defamation, regardless of bad faith or malice. *See Smith v. Maldonado*, 72 Cal. App. 4th 637, 646 (1999). Only if Plaintiff overcomes ABC's defense of truth (he cannot), would he be required to satisfy the next element of his claim – that ABC made the alleged defamatory statement with actual malice. *See, e.g., Thomas*, 189 F. Supp. 2d at 1017 ("because the allegedly defamatory implications are not actionable, there is no need for the Court to consider whether Plaintiff has made a showing of actual malice").

### 3. **Plaintiff Cannot Establish That The Alleged Defamatory Statements Are Actionable**

ABC's Anti-SLAPP Motion will be limited solely to Plaintiff's inability to establish (as he must) that the News Report contained false statements of fact about

20

him. As summarized below, the Anti-SLAPP Motion will establish that each of the statements which Plaintiff attacks is not actionable.[4]

**Statement No. 1**: Plaintiff has a "25-room mansion, a $6 million yacht, a private jet, a helicopter, and seven luxury automobiles."

In support of the Anti-SLAPP Motion, ABC will present evidence that it is true that Plaintiff lives in a residence that can only be characterized fairly as a "mansion," in fact, a multi-million dollar seven thousand plus square foot home on a large piece of property in the affluent Palos Verdes community. It is equally true that Plaintiff travels in a private jet – in fact, in Plaintiff's own words, it is the "Cadillac" of jets. Plaintiff also drives (or has driven) a luxury automobile – in fact, he delights in touting his $150,000 Rolls Royce. Plaintiff repeatedly and publicly touts his wealth. Accordingly, even if Plaintiff was not literally referring to his own material wealth in the Clip, Plaintiff's long list of material possessions satisfies the test of substantial truth. Put differently, the "gist and sting" of the sermon as used in the News Report is more than justified. Statement No. 1 is not actionable.

**Statement No. 2**: Plaintiff "boasts" about his prosperity.

ABC will present an abundance of evidence that Plaintiff frequently publicizes, and brags about, his material prosperity. In fact, Plaintiff refers to himself as the "Prophet of Prosperity," and makes the following admission in one of his own publications: "Money *does* come to me. Money comes to [my wife] and me in such a way that it is almost embarrassing." In any event, the term "boast" is no more than a colorful (and accurate) way of expressing what Plaintiff does on a regular basis – *i.e.*, speak excessively about his material riches. Finally, the term "boast" is also an expression of subjective judgment, which is perfectly fitting given the evidence ABC

---

[4] ABC will proffer an abundance of evidence in support of its Anti-SLAPP Motion. Should the Court wish to view such evidence in connection with the instant discovery dispute, ABC will readily submit the evidence upon request. Fink Decl. ¶ 12.

will proffer of Plaintiff's well-publicized, constant references to the wealth Plaintiff has amassed. Statement No. 2 is not actionable.

**Statement No. 3**: "Leonard . . . thought it was un-Christian that he, and he, and she, and so many others [while flashing a one-second image of Plaintiff among other televangelists] ask donors for money but don't reveal exactly how they spend it."

This statement pertains to Rusty Leonard's opinion as to the financial openness (or lack thereof) of ministries. During this portion of the News Report, an image of Plaintiff, among other ministers, appears on the screen. This statement fails to be actionable as an initial matter because it is Leonard's subjective opinion, and thus fails to meet the test of a provably false assertion of fact. Further, this statement is solely a statement on morality, which is not actionable because it is impossible to prove whether Plaintiff's level of financial transparency makes him "Christian" or "un-Christian." In any event, Statement No. 3 is true, or substantially true. It is true or substantially true that Leonard's evaluation of Plaintiff's ministry revealed that Plaintiff does not reveal exactly how he spends donations. Further, it is true or substantially true that Plaintiff and his church ask for donations, but do not reveal to third parties how donations are spent. Statement No. 3 is not actionable.

### 4. Plaintiff Cannot Avoid The Truth Of The Statements By Unreasonably Straining The Meaning Of The News Report

In a thinly veiled effort to sidestep the truth of these express statements, Plaintiff attempts to glean implied defamatory statements from the News Report. Plaintiff contends the News Report implies that he is "corrupt, unethical and that he had stolen money from his church," and that he is "unfit to serve as a minister, and that his wealth was misappropriated from his parishioner's donations." *See* Parts I, IV (Plaintiff's portion of Joint Stipulation).

A simple review of the approximately six-minute forty-eight second (06:48) News Report, however, reveals that Plaintiff's interpretation of the meaning of the News Report is flatly wrong. As an initial matter, the News Report does not require any

special interpretation (by Plaintiff, his so-called expert, or anyone else for that matter). The News Report is straightforward and is delivered in very plain language. The substance of the News Report is equally clear. The News Report is a story about the financial openness of ministries. The story opens with a montage showing ministers who lead lavish lifestyles, and then the News Report features a relatively long interview with Rusty Leonard about his watchdog group, Ministry Watch. Leonard is introduced as a "deeply religious" man who evaluates Christian ministries according to his understanding of Christian teachings. Leonard explains that some ministers are open about their finances, some are not. Leonard frowns upon the latter, particularly when the ministers lead extravagant lifestyles. He provides his opinion that ministers should be open about their finances so that donors would know how their money is being spent. In short, the interview with Leonard features his personal views that donors should be informed about the use of their donations because it is morally right (in Leonard's opinion). The interview with Leonard is within the larger "Enough" program, which showcases interviews with individuals who, like Leonard, have taken personal moral stances on a variety of topics.

The News Report does not state expressly or impliedly that Plaintiff is corrupt, unfit to be a minister, or steals money from his church. In fact, the News Report expressly states the contrary. Stossel refers to Leonard as a man who holds ministries to a higher standard than what is legally required of them. Stossel describes Leonard as a man who believes that complying with IRS regulations is "not good enough." Additionally, Stossel explicitly states that while most charities are legally required to publicly report their finances, religious organizations are <u>not</u> legally required to do the same. Stossel goes on to describe Leonard's efforts to encourage ministries to publicly report their finances despite no legal obligation to do so. Thus, so-called "implications" that Plaintiff is stealing, or committing criminal conduct simply do not comport with the actual story contained in the News Report. (Nor do the alleged "implications" amount to provably false assertions of fact in any event.) Plaintiff's interpretation of the News

171790.1                                    23
JOINT STIPULATION RE DISPUTE IN DISCOVERY MATTER

Report is not a reasonable one; therefore, it cannot be the basis for a claim for defamation by implication.

## V. TRINITY DEFENDANTS' CONTEND

Trinity incorporates by reference ABC's position as set forth above. Further, Price has confused the preliminary threshold inquiry as to whether his interpretation of the 20/20 segment is reasonable, which is determined as a matter of law, with a second inquiry as to how the allegedly defamatory statements were ultimately understood. The former needs no discovery and is relevant to the anti-SLAPP motion. The latter is a question of fact which will form the basis for discovery should Price defeat the anti-SLAPP motion.

## VI. PLAINTIFF SEEKS LIMITED DISCOVERY AS TO INTENT.

Here, Plaintiff seeks limited discovery at this time to demonstrate the ABC Defendants' intent in creating the Program. Such proof of actual malice by the ABC Defendants will be proof of their intent to create the defamatory implications alleged. Specifically, Plaintiff seeks all footage of Plaintiff that was received by the ABC Defendants from the Trinity Defendants as he believes discovery of this material will reveal that the ABC Defendants received enough footage of Plaintiff's Sermon to determine that he was not speaking of his own material possessions. Yet, the ABC Defendants intentionally and deceptively edited the footage to falsely attribute statements to Plaintiff that appeared to be self-condemnatory admissions of misappropriation and unethical conduct.

Plaintiff also seeks to take the depositions of Defendant Glen Ruppel, the Program's producer, Defendant John Stossel, the Program's reporter, Ruth Iwano, the Program's Editor, and the person most knowledgeable at Trinity Foundation who corresponded with the ABC Defendants and provided footage to the ABC Defendants. Plaintiff believes the aforementioned witnesses' deposition testimony will reveal that the ABC Defendants' intent was to create a Program that caused viewers to believe that the featured preachers were living extravagant lifestyles by misappropriating and diverting